D1G9JOHS

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        11 CR 0487 (RJS)

 5   JOHN JOHNSON,

 6                  Defendant.

 7   ------------------------------x

 8                                        New York, N.Y.
                                          January 16, 2013
 9                                        4:42 p.m.

10
     Before:
11
                     HON. RICHARD J. SULLIVAN
12
                                          District Judge
13

14                        APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     TODD BLANCHE
17   NOLA HELLER
          Assistant United States Attorneys
18
     DAVID S. GREENFIELD
19   JAMES NEUMAN
          Attorneys for Defendant
20

21

22

23

24

25

D1G9JOHS

1          (In open court; case called)

2          MR. BLANCHE:  Good afternoon, your Honor.

3          Todd Blanche for the government.  With me at counsel

4    table is AUSA Nola Heller and FBI special agent Rachel Kolvek.

5          THE COURT:  Good afternoon to each of you.

6          For the defendant.

7          MR. GREENFIELD:  Good afternoon.

8          David Greenfield for John Johnson.  And also seated at

9    counsel table is Jim Neuman, an associate of mine.  We're in

10   the same suite of offices.

11         I would like to propose that Mr. Neuman be assigned by

12   the court for purpose of assisting me during the course of the

13   appellate process in this case.  We worked often on other cases

14   before.  He's familiar with the facts of this case.  He, in

15   fact, has helped me pro bono for the motion practice and is

16   aware of a number of the issues.

17         So he's on the CJA panel.  I've discussed this -- in

18   other cases we've worked together similarly.  But particularly

19   in this case, Judge, I've just been assigned two death eligible

20   cases within the last month.  Both in stage one of the

21   proceedings.  And my time is going to be unfortunately put more

22   toward that than to the appellate process.  And for all those

23   reasons, I would ask the court to appoint Jim Neuman as an

24   associate for the purpose of the appeal in this case.

25         THE COURT:  And he would then be compensated at the

D1G9JOHS

```
 1   CJA rate, the regular CJA rate?
 2              MR. GREENFIELD:  That's correct, your Honor.
 3              THE COURT:  Government have any objection to that?
 4              MR. BLANCHE:  It does not.
 5              THE COURT:  All right.  I will grant that notion
 6   motion.
 7              So, Mr. Neuman, I will appoint you for purposes of the
 8   appellate process.  And you should submit bills -- who is --
 9   Mr. Neuman will submit them or you'll submit them yourself?
10              MR. GREENFIELD:  Mr. Neuman will submit them.  I doubt
11   that I'll submit a bill, Judge.  I may help him but I'm not
12   going to be submitting a duplicate bill if that's what the
13   Court is asking.
14              THE COURT:  So that motion is granted.
15              Let me say good afternoon to each of you and good
16   afternoon to Mr. Johnson as well.
17              And there are friends and family members here as well,
18   Mr. Greenfield?
19              MR. GREENFIELD:  Oh, yes.  A good number of his family
20   and friends as well.
21              THE COURT:  This is a public proceeding so all are
22   welcome here.
23              I want to thank you for taking the time to be here.
24   I'm sure it means a great deal to Mr. Johnson.
25              Some of you wrote letters to the court and I've read
```

D1G9JOHS

1    those letters.  Thank you for taking the time to do that.

2           Mr. Blanche, you indicated that the victim's mother

3    and perhaps others wish to speak on behalf of the victim?

4           MR. BLANCHE:  Ms. Garcia is here and would like to

5    address the court.  She's here with other friends and family.

6    And then I have a letter that I've been asked to read into the

7    record at an appropriate time from Mr. Garcia's sister.

8           THE COURT:  Welcome to all of you as well.  Some I

9    have seen before.  Others not.  Thank you for being here.  The

10   victims have a right to speak in a court proceedings and so,

11   obviously, we'll allow that to take place.  And then the letter

12   that Mr. Blanche referred to, I'll certainly allow him to read

13   that into the record as well.

14          We're here for sentencing.  Mr. Johnson was convicted

15   at trial on the three counts of the indictment by a jury.

16   Mr. Greenfield, on Mr. Johnson's behalf has filed motions under

17   Rule 29 and Rule 33.  Those motions are denied.  So sentencing

18   is what remains.

19          I want to go over with the parties what I've reviewed

20   in connection with sentencing, and then if there's anything

21   that I've over looked, by all means, let me know.

22          I was the presiding judge at trial so I'm familiar

23   with what took place at the trial.  I've reviewed the

24   transcript in parts.

25          I've also reviewed the presentence report prepared by

D1G9JOHS

1    the probation department.  It's dated November 29.  It is a

2    19-page, single-spaced report.  It also includes a

3    recommendation by the probation officer.

4            I have reviewed Mr. Greenfield's sentencing memorandum

5    which is a six-page, double-spaced memorandum.  In addition, it

6    includes attachment, a letter from Mr. Johnson's grandmother

7    who raised him, some of the time raised him.  And just

8    yesterday I received a letter from Jenecca Williams, who is

9    Mr. Johnson's cousin.  I've reviewed that letter as well.

10           Then I have reviewed the government's sentencing

11   memorandum which is a twelve-page, double-spaced submission

12   dated January 10.

13           And I think that's really it in connection with

14   sentencing.

15           So is there anything else that should be part of the

16   record that I've not referenced?

17           MR. BLANCHE:  Not from the government.

18           THE COURT:  Mr. Greenfield?

19           MR. GREENFIELD:  I'm not aware of anything.

20           THE COURT:  Well then let's start with the presentence

21   report.

22           Mr. Greenfield, you've received a copy of the

23   presentence report?

24           MR. GREENFIELD:  Indeed I have, your Honor.  I've

25   reviewed it on a number of occasions with my client.  We have

D1G9JOHS

1    no objections at this time to whatever is in the report.

2            THE COURT:  To what's in the report.  Obviously, you

3    dispute the jury's verdict and you've made it clear you intend

4    to appeal, as is your right.  But with respect to the findings

5    I've set forth and the guidelines calculation set forth in the

6    presentence report, you have no objection?

7            MR. GREENFIELD:  That's correct.

8            THE COURT:  Mr. Blanche, you have reviewed the

9    presentence report as well?

10           MR. BLANCHE:  Yes, your Honor.

11           THE COURT:  You and Ms. Heller.

12           And do you have any objection to anything in it?

13           MR. BLANCHE:  No, your Honor.

14           THE COURT:  All right.  Well Mr. Johnson let's start

15   with the presentence report.  And one of the things that we'll

16   focus on for a few minutes is the sentencing guidelines

17   application in this case.  I'm sure Mr. Greenfield has

18   explained to you the sentencing guidelines.

19           THE DEFENDANT:  Yes, sir.

20           THE COURT:  To some extent.  Right.

21           And others here may be less familiar with the

22   sentencing guidelines.  So let me tell you what they are and

23   how they work.

24           The sentencing guidelines are a big book that is put

25   out by a commission.  The commission is called the United

D1G9JOHS

1    States Sentencing Commission.  And it's made up of judges and

2    experts in the field, lawyers primarily.  They are tasked with

3    putting out this book each year.  And certain changes are made

4    on a yearly basis.

5            But the way it works is as follows.  Every crime or

6    type of crime is covered by a chapter or a subchapter in this

7    book.  And a judge is directed then to go to the book, go to

8    the appropriate chapter, and make certain factual findings and,

9    on the basis of those findings, points are assigned.  So the

10   court goes through the process of adding and subtracting

11   points.  And then at the end of that comes up with a number.

12   That number is referred to as the offense level.

13           There then is a separate calculation done under a

14   different chapter in the book that's referred to as the

15   criminal history category.  Not surprisingly, a person who has

16   previously been convicted of crime, a person who has previously

17   gone to jail for other crimes is treated more harshly than a

18   person who has no prior convictions.  Again, the judge goes to

19   that chapter, makes findings about whether there were prior

20   convictions; if so, when they were, for how long, whether the

21   defendant committed this crime while on supervision for that --

22   for those other crimes.  In any event, it's a mathematical

23   process.  The court adds and subtracts and comes up with

24   another number.

25           There are six criminal history categories.  One is the

D1G9JOHS

1    lowest, the least serious.  Six is the highest and the most

2    serious.  So the court selects which is the appropriate

3    criminal history category, one through six.

4           And then on the basis of those two findings, the

5    offense level on the one hand and the criminal history category

6    on the other, the court is directed to make a finding as to

7    what is the appropriate range of sentence according to this

8    book.

9           And if you go to the back of the book, there's a

10   table.  And it's very straightforward.  One axis, one part of

11   the book, the table in the book relates to the offense level

12   and the other axis going across reflects the criminal history

13   category.  And the spot on the chart where those two meet is

14   the range that, according to the commission that prepares this

15   book, would be appropriate under the circumstances.

16          Now, judges are not required to follow this manual.

17   We don't have to slavishly adhere to it.  But judges are

18   required to consider this manual and to make findings and to

19   decide what the range is.

20          After that, a judge is required to consider a variety

21   of other factors.  And I might as well say what those are now,

22   but we'll be talking about them, I'm sure, at some length.

23          Those other factors include the defendant's personal

24   history.  Mr. Johnson's a complicated person, like everyone is,

25   and so he has an entire life that has to be considered by the

D1G9JOHS

court.  So I will look to the circumstances of his birth and childhood, his upbringing, his educational background, his work history, his criminal history, his family relationships today and throughout his life, all the things that make him who he is; good, bad.  Everybody is complicated.  So the court is required to consider the whole person.

In addition, the court is required to consider the facts and circumstances of this crime or these crimes.  This is a very serious crime.  Resulted in the death of another human being.  So that's about as serious as a crime can get.

But it's not just what the label of the crime is. It's the details of the crime.  What Mr. Johnson did.  What the jury found that he did.  What I will find that he did.  And what others did relative to him.  And the Court is required to really focus on the particular details of the crime.

The goal is to fashion a sentence that reflects the seriousness of the crime and that promotes respect for the law and that provides a just punishment for the crime.

So that's very, very important.  The court looks to the circumstances of the crime that's involved.

In addition, the court has to consider the need to deter or discourage the defendant, Mr. Johnson, and others from committing crimes in the future.  And if you think of it this way, one of the objectives of the sentencing is to send a message to the individual defendant but also to a wider public

D1G9JOHS

1    so that people understand that these types of crimes just won't

2    be tolerated.  And, hopefully, Mr. Johnson and others will see

3    that there is such a cost to this conduct that they will never

4    commit crimes like this again.  And that other people will not

5    commit them in the first place.  And the hope is that there

6    will be fewer crimes like this because of the sentence imposed

7    in this case.  It would have a deterrent effect or a

8    discouraging effect.

9         Now it's sometimes hard to know what the effect of a

10   sentence will be and how broadly it will be felt.  But Congress

11   has found -- and I think most of us understand intuitively that

12   there's something to that, that there is a message that gets

13   sent by a sentence and that that's a legitimate objective of

14   sentencing.  So I'll factor that in as well.

15        Other factors that I have to consider are

16   Mr. Johnson's own needs while he's in custody.  So to the

17   extent he has medical needs or mental health needs or substance

18   abuse treatment needs, the need for educational opportunities,

19   vocational training, all of those things are properly

20   considered by the court in fashioning an appropriate sentence

21   so that when he's released, if, in fact, he's -- doesn't

22   receive a life sentence, that he would have skills and the

23   ability to live productively when he gets out.  So that's

24   another factor I have to consider.

25        Another factor I have to consider is the need to avoid

D1G9JOHS

1    disparity between the sentence imposed in this case and the

2    sentence imposed on other people in this case or in other cases

3    that are similarly situated.

4              The point is it would be unfair if a person does much

5    more time or much less time than other people who did basically

6    the same thing simply because of who the judge was or because

7    of who the lawyers were.  The goal is to have rough equality so

8    that the people who have done the same thing with similar

9    criminal histories are treated roughly the same.

10             If that were not the case, if it was arbitrary or if a

11   certain judge were -- judges were real really, really tough,

12   others very, very lenient and it all just turned on who the

13   judge happened to be, people would lose respect for that

14   system.  They would wonder whether this was fair system.  So

15   courts are required to take into account what others have

16   received or would receive in similar circumstances.  So, the

17   hard part for me is to balance all of those things.

18             The guidelines are one factor.  And we're going to

19   talk about the guidelines in a moment.  But the other factors

20   are also important, and we'll talk about those.  Mr. Greenfield

21   has talked about those in his submission.  The government has

22   as well.

23             So we'll start, Mr. Greenfield, with the presentence

24   report and the guidelines.  And I don't think there's any

25   dispute about what the guidelines are in this case.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D1G9JOHS

| 1 | In this case, because of the nature of the crime, the |

           In this case, because of the nature of the crime, the
fact that another person was killed, the base offense level is
level 43.  That's the highest level under the guidelines.
That's pursuant to section 2A1.1.

           The criminal history category that applies here turns
on the fact that Mr. Johnson has prior convictions from 2007
and 2008, both for criminal possession of a controlled
substance in the Bronx, each of which resulted in 30 days
imprisonment.  There is also another 2008 -- there's a 2009
conviction for conduct that was in 2008, also in the Bronx,
related to the criminal sale of a controlled substance.  That
resulted in a one-year sentence.  And then there was a criminal
trespassing charge that Mr. Johnson pled guilty to in 2009.
That resulted in three days of custody.

           According to the presentence report -- and I think
there is no objection, that is five criminal history points.

           Now, was Mr. Johnson on supervised release or parole
at the time the instant offense was committed?

           MR. BLANCHE:  No, your Honor, I don't believe he was.
But I believe Mr. -- we should have brought this up earlier,
but Mr. Greenfield indicated that the conviction in paragraph
42 for criminal trespassing should, under the guidelines, not
result in any criminal history points.  I believe that was in
Mr. Greenfield's submission.  And the government doesn't
dispute that.  So I believe that Mr. Johnson has five criminal

D1G9JOHS

1    history points -- I'm sorry, four criminal history points.

2            THE COURT:  Okay.  So four criminal history points or

3    five criminal history points puts him in criminal history

4    category III.  So it doesn't really make a difference for

5    purposes of the guideline calculation.

6            MR. BLANCHE:  Agreed.

7            THE COURT:  But the parties agree that paragraph 42

8    should be amended to indicate no criminal history points?

9            MR. BLANCHE:  Yes, your Honor.

10           MR. GREENFIELD:  Yes, your Honor.

11           THE COURT:  But the question I had so at the time of

12   the robbery and the shooting, Mr. Johnson was not under any

13   kind of supervision from the state court system?

14           MR. GREENFIELD:  That's my understanding.

15           MR. BLANCHE:  Correct, your Honor.

16           THE COURT:  All right.  Based then on a criminal

17   history category of III and offense level of 43, the sentence

18   recommended or directed under the guidelines is a life

19   sentence.  So, that's the guidelines.  There are other factors,

20   of course, that I have to consider.

21           So Mr. Greenfield, I'm happy to hear from you.

22           MR. GREENFIELD:  Do I go before the victim impact

23   statement or after?

24           THE COURT:  I don't think there's any required way to

25   do it.

D1G9JOHS

1          Does anybody have a preference?

2          Mr. Blanche.

3          MR. GREENFIELD:  The only time -- Judge, the only time

4     I've been involved with that, it preceded my presentation, so I

5     can possibly comment on it.

6          THE COURT:  I will give you an opportunity to comment

7     regardless.  But that's fine, if Mr. Garcia's mother would like

8     to address the court now.

9          MR. BLANCHE:  Address the court now?

10         THE COURT:  Yes.

11         MR. BLANCHE:  Does your Honor want her to speak at the

12    lectern?

13         THE COURT:  At the lectern would be great if you could

14    keep your voice up and state your name and spell your name for

15    the record.

16         MS. GARCIA:  My name is Evlyn Garcia.

17         THE COURT:  All right.  Ms. Garcia, good to see you.

18    I saw you previously and you testified at trial.  So thank you

19    for being here today.

20         MS. GARCIA:  Thank you for having me.

21         I was supposed to write something.  I started to

22    several times.  I just couldn't because what really could I say

23    to what he did to my son.  I don't know.  I said maybe when I

24    saw him I would know what to say.

25         What I did want to say was what kind of kid my son

D1G9JOHS

1  was.  My son was a very good boy.  He was only 16.  He was very

2  loved by all his family.  He might have started hanging out

3  with his friends and been at the wrong place waiting for

4  whatever he was doing there.  But despite all of that, my son

5  didn't have a weapon.  My son didn't charge at the defendant.

6  My son didn't -- he was actually on the floor picking up

7  quarters from playing, from shooting quarters with his friend.

8  He was on the ground and he went and shot my son despite that

9  he -- you know, my son couldn't defend himself.  And how does a

10 person shoot a 16-year-old young boy?

11        I have a hole in my heart.  It will never be covered.

12 My daughter, she's been a mess.  She's going to school.  Thank

13 God she's graduating soon.  I have two boys over there who are

14 raised -- who are being raised without their brother.  They

15 were eight and ten when he died.  I have a whole entire family

16 who misses my son.  He was very charismatic.  He was the joker

17 of the family.

18        And you know what he did here, he destroyed two

19 families here because I'm pretty sure he destroyed his family

20 who are not going to have him around.  And he destroyed my

21 family who I'm never going to see my baby ever again.  My son

22 would have been 21 right now, maybe in college.  And that's

23 just not going to happen.  And I'm never going to see him

24 again.  And it's not fair because that was my baby.  He was my

25 firstborn son.  He was even born in a special way.  I had him

D1G9JOHS

1    at home.  I didn't even get to get to the hospital.

2              He was just very special.  He would do so many things

3    for me.  I had seven stomach surgeries and my son took care of

4    me every single time.  He would help me bathe.  He would help

5    me dress.  He was always there for me.  He defended me to the

6    end.  Anybody who would say anything about me, he always

7    defended me.  He was my right-hand.  He was my little buddy

8    because at the time my other two boys, they were very young.

9    He was 16.  He was -- my daughter was away in college.  He was

10   the one who would spend the nights up with me watching TV.  He

11   used to make chocolate covered strawberries for me.  I will

12   never have that again.

13             I just wanted to know why.  Why would he shoot my son?

14   If he is allowed to even answer that.  I've waited five years,

15   one month, and fifteen days to understand and know why my son

16   is dead.  Because I don't understand it.

17             My son was picking up quarters from the ground.  He

18   didn't -- I don't understand -- I don't understand.  I don't

19   know why he would shoot my son, and I would really, if he is

20   allowed to speak.

21             THE COURT:  Mr. Johnson will have the right to speak

22   if he wants to but he's not required to, and no one can make

23   him answer that question, if there is an answer to that

24   question, I don't know.  But it's a question that everyone is

25   wondering and the reality may be there is no answer to that

D1G9JOHS

1    question.  But that doesn't make it any easier.  I agree.

2                MS. GARCIA:  In conclusion, I just want to say that

3    you know what he did, a lot of kids are doing this.  It's not

4    fair.  Destroys families.  Destroys people.

5                My family has never been the same.  I have an uncle,

6    the one who raised me, who was like my father, who raised my

7    son as well.  That was the love of his life.  And my uncle died

8    very soon after him of sadness.  He couldn't take the pain, the

9    loss of my son.  I became an alcoholic.  I was in and out of

10   rehabs for two years.  I gave my kids away to my mother for two

11   years because I became a hateful person.  I didn't care about

12   no one.

13               Thank God I got my life together, and I got my

14   children back, and I moved, and I even went back to school

15   trying to be a better person.

16               But I still -- my life is never going to be complete

17   because I don't have my son with me.  And I just want you to

18   know that you destroyed my life by that action that you did.

19   And that's all I have to say.

20               THE COURT:  All right.  Thank you, Mrs. Garcia.  I

21   appreciate it.

22               MS. GARCIA:  Thank you for listening.

23               THE COURT:  Mr. Greenfield.

24               MR. GREENFIELD:  I thought a letter was going to be

25   read.

D1G9JOHS

1          THE COURT:  Let's do that then as well.

2          MR. BLANCHE:  This is a letter from Maria Garcia which

3    is the victim's older sister, your Honor.

4          My brother.  Although he was two years younger than me

5    was like my twin.  Because we looked identical.  He was a

6    jokester.  Sweet and funny.  I found out I was pregnant with my

7    daughter the same week you killed my brother.  And I never got

8    to tell him that.  Luckily, my mother told him behind my back.

9    And, thank God, my daughter came out looking and acting just

10   like him.  How dare you think that you could have gotten away

11   with this.  I hope you live a miserable life knowing that you

12   not only took an innocent kid's life but that you've hurt so

13   many people as well.  Tinkey's family and friends miss him so

14   much.  We've waited four-and-a-half long years and I'm glad

15   justice has finally been served.

16         THE COURT:  Okay.  Thank you.

17         MR. GREENFIELD:  May I proceed?

18         THE COURT:  Yes.

19         MR. GREENFIELD:  I don't know how long we've known

20   each other, Judge, but I -- it's been a while.  But I've been

21   doing this for 46 years now, and I have to say this is probably

22   the most difficult sentencing that I have ever been involved in

23   for a number of reasons.  And I mean to hear a mother's grief

24   like I just heard and to hear a sister's grief like I just

25   heard, it's hard to follow.  But the fact that a life was lost

D1G9JOHS

1    is clearly a tragedy.

2            But in fashioning a sentence and arguing for my client

3    here today, Judge, I want to do the best I can for him to

4    assure that a near tragedy doesn't occur with respect to him.

5    There are, as the court heard during the course of trial, there

6    are some significant issues as to whether or not he truly was

7    the individual who was a young black man who shot Bernardo

8    Garcia.  There's significant issues about that that will be

9    dealt with on appeal.  I'm not going to retry the case now,

10   Judge, I don't intend to.  Try to avoid retrying the case now.

11   But there were significant hard issues as to whether or not he

12   was the young black man in the hallway that day who pulled the

13   trigger that killed Bernardo Garcia.

14           I understand the PSR is calling for a life sentence.

15   I understand the government is asking for it.  But I

16   respectfully suggest to your Honor that under the facts of the

17   case, as to the involvement of the young black man -- young

18   black kid, I think it was actually, that was referred to in the

19   FBI reports initially describing the shooter, there's a

20   significant issue as to whether or not he is that individual.

21           THE COURT:  Look, Mr. Greenfield.  I know those

22   arguments -- those are best left for the appeal, obviously.

23   But the jury found him guilty.  And so I'm going to sentence

24   him based on that finding.  I don't think it was irrational for

25   the jury to reach that conclusion.

D1G9JOHS

1          So, you argued in your letter, or you suggested that

2     there's sort of -- tenuous nature of the evidence implicating

3     Mr. Johnson is sort of -- should be a relevant factor as to

4     what is the appropriate sentence.

5          Is that right?  Do I have that right?

6          MR. GREENFIELD:  It was overstated, Judge.  I

7     understand.  He was convicted by a jury.  He must stand

8     sentenced now.  The individual who committed the crime,

9     whether -- let me withdraw that last statement.

10          He must be sentenced now because the jury found him

11     guilty.  Understood.

12          Looking at the facts of the case as I heard them

13     during the course of the trial, and taking into consideration

14     the factors under 3553(a) that the Court must consider in

15     meting out sentence in this case, I think a sentence of a

16     nonlife sentence is called for in this case.  And if the court

17     will allow.

18          THE COURT:  I definitely want to hear you.  I will

19     allow it anyway, but you have a right to make those arguments

20     so by all means go ahead.

21          MR. GREENFIELD:  What you have here is a robbery that

22     was hastily planned by the government witness Donnell

23     Richardson.  He brought in his two friends, according to

24     Donnell Richardson, Mr. Reed and Mr. Gonzalez, to help in the

25     course of a robbery.

D1G9JOHS

1            According to Donnell Richardson there was no violence

2    that was intended to occur during the course of that robbery.

3    But it was merely just to scare the individuals in the hallway

4    so Richardson could take over the drug operation in which

5    Mr. Garcia and another individual were involved.

6            Apparently at the last second Reed recruits somebody

7    described by Mr. Richardson, initially described by

8    Mr. Richardson as a young black kid.  And that person was

9    brought in as a second gun during the course of the robbery.

10           Reed enters the hallway where the drug operation is

11   located.  And he enters firing his weapon apparently.

12   Apparently the gun goes off in the hand of the second

13   individual, the young black kid, and Mr. Garcia is shot and

14   unfortunately passes away.

15           The only witness to the murder is Garcia's -- actually

16   in the hallway is Garcia's compatriot who is working.  That

17   compatriot doesn't give a description about the shooter at all.

18   He just says he believed he's black.  Couldn't even give a full

19   clothing description much less a description of the individual.

20           But clearly, according to both Richardson and the

21   individual in the hallway, the young black kid was not the

22   planner of the robbery, was not the leader of the crew, was

23   brought in at the last second.  And apparently, according to

24   the government's proof here, the gun might have gone off

25   accidentally or unintentionally.  That's how I heard the proof

D1G9JOHS

1    during the course of the trial.  That's how I heard it coming

2    in.  The gun was discharged during the course of the robbery.

3              THE COURT:  No question about that.

4              MR. GREENFIELD:  Sorry, Judge?

5              THE COURT:  No question about that.  The gun was

6    discharged during the course of the robbery.

7              MR. GREENFIELD:  And sadly, Bernardo Garcia was hit by

8    that discharged weapon.

9              THE COURT:  Yes.

10             MR. GREENFIELD:  It seemed clear to me -- and maybe

11   the court sees it differently -- but there was no intent for

12   anybody to get shot during the course of that robbery.  There

13   was no intent for anybody to be killed during the course of

14   that robbery.

15             THE COURT:  Well I mean it's distinguishable from a

16   premeditated murder situation where someone is planning for

17   days, hours, weeks, to actually kill another person.

18             But it's a felony murder, a robbery with guns that led

19   to the death of another individual.

20             MR. GREENFIELD:  The government could have chosen to

21   charge the count any way they wanted to, the murder count.

22   They chose to charge it as a 924(j), which gives the Court the

23   greatest discretion in sentencing of any count charging murder.

24   The sentence can go anywhere from probation all the way up to

25   life on a 924(j).

D1G9JOHS

1          But clearly the government chose that count because I

2     would assume they weren't sure whether it was an intentional

3     shooting or not, if it was meant to be an intentional shooting.

4     Clearly their witnesses don't indicate that it was intended to

5     occur.  But clearly a shooting took place during the course of

6     a robbery and a death followed.  Under the state law system

7     that's a felony murder.

8          THE COURT:  Right.

9          MR. GREENFIELD:  I'm not arguing the fact that it's

10     not a murder, Judge.  I'm arguing the fact that whoever that

11     young black kid was, and if indeed it was John Johnson, didn't

12     enter there with the thought of committing a murder.  Something

13     went wrong and a death occurred.

14          Now the Court, because of that, has to mete out,

15     fashion a sentence.  And I don't envy you the job in this case,

16     Judge.  I don't.

17          THE COURT:  It doesn't pay much either but it is what

18     it is.

19          So, look, I yesterday imposed a life sentence on

20     Mr. Reed.  There are differences between Mr. Reed and

21     Mr. Johnson.  Differences in terms of age.  Differences in

22     terms of criminal history.  Differences in terms of I think

23     responsibility for planning the robbery.  But also differences

24     in terms of who pulled the trigger that killed Mr. Garcia.

25          MR. GREENFIELD:  Clearly.

D1G9JOHS

1          THE COURT:  So I think at some point it's worth

2     addressing those differences.  I don't want to take you out of

3     the order you were pursuing.

4          MR. GREENFIELD:  Actually, I was at the point where I

5     was going to go through the 3553(a) factors.

6          Start with, before we even get to that, if, in fact,

7     he was the individual -- and all my comments about the crime

8     itself is he denied it.  So I don't want it to have anybody say

9     that I am acknowledging his involvement because he certainly

10    never did that to me.

11         Certainly the crime was the brainchild of the

12    government's witness, Donnell Richardson, a career criminal who

13    has had many opportunities to go straight and narrow in the

14    past and always went far and wide instead.

15         He recruited somebody who he says was a past partner

16    in crime, Mr. Reed, and apparently a past partner in crime in

17    Mr. Gonzalez also.  But they're the ones who talked about this

18    robbery.  They're the ones who planned the robbery.  And the

19    young black individual who was the second gun was not a party

20    to that at all.  He certainly did not think to -- he didn't

21    even know that there was drugs being sold in that hallway,

22    whoever that young black was, prior to the time he went into

23    the hallway.

24         Clearly it was a crime of Richardson.  Clearly it was

25    being carried out by Reed.  And if my client was there, other

D1G9JOHS

than the fact that he's apparently the person who pulled the trigger, he was not a leader, a manager, or in any way somebody who put this deal together, this unfortunate, terrible incident that happened.

His life, to begin with, was a shambles.  His mother basically abandoned him almost at birth.  He grew up in a foster home system.  His maternal grandmother who is -- excuse me paternal grandmother who is now living in the Carolinas -- North Carolina, I believe it is, can't be here today, raised him almost from the toddler stage until he was a teenager.  And she raised him to be, according to her letter, a fine, respectable man.

His father, who he has maintained a good relationship with, over the years had another home where he had other children.  But he always was there for his son.  He was here everyday during the course of trial.  He's here today in the audience.  And he's with his son day in and day out, at least in spirit.

His aunt is also here, lived with his grandmother and helped raise him too.

He worked in his father's business, which is a paper goods business, for many years, while he was attending school and while he was out of school, actually.  He worked for his father for a good three or four years as far as I know.

At the time of his arrest he was working for a caterer

D1G9JOHS

1    located in Central Park, one of the pavilions in Central Park,

2    and had worked there for over a year on a steady basis.

3        He has no violence in his background whatsoever.  If

4    anything, he enjoyed smoking marijuana a little bit too much

5    and that got him involved in street level drug distribution.

6        He has a son who I believe is six years old -- six

7    years old now who he helped raise, who is being raised by his

8    grandmother now down in North Carolina.  His son lived with him

9    until his arrest in this case and with his grandmother.  His

10   grandmother, as I said, moved down to North Carolina almost

11   after the -- a few days after the trial ended.

12       A picture emerges of him, I think, of somebody who

13   came up in tough circumstances and did as much as he could

14   under the circumstances growing up where he grew up to try to

15   make a life for himself.  His grandmother's letter shows what a

16   decent -- what she considers him to be, a decent

17   self-respecting -- a decent respectful person.

18       His cousin, Jenecca Williams, wrote a, I thought, very

19   touching letter which I sent to the court yesterday, speaks of

20   him in glowing terms, saying how devastated she is by the

21   circumstances here.

22       Mrs. Garcia had it right.  Two families are crushed

23   here.  The loss of her son, he'll never be replaced.  My

24   concern -- my concern for him is he's 24-years-old.  His record

25   other than drug sale is minimal.  He has a good relationship

D1G9JOHS

with his family.  He worked when he could.  He's got a son who
loves him.  And I don't believe a life sentence is called for
here, Judge.

He is not the type of person that you sentenced
yesterday.  And he's not the kind of guy you see very often in
here charged with violent crimes.  I think, given a sentence of
20 years, the interests of justice would be well served.  And I
believe, based on the guy I've gotten to know over the course
of this case -- and I've gotten to know him, spent a lot of
time with him and respectful is the right word when you
describe him.  He is a -- just a -- I won't say -- he's a good
person to sit with and talk.  I mean it's -- sometimes I don't
want to go to the MCC or MDC to see who I have to see.  I've
never felt that way about seeing my client.  It was always a
good time being spent both in going forward with the case and
also talking to somebody who I knew was listening to what I was
saying and was taking what I was saying to heart when we spoke.

Judge, I can only -- and I respectfully suggest to
your Honor that a life sentence is not called for.  I
respectfully suggest, your Honor, to your Honor that 20 years
will serve the interests of justice and yet after that 20 years
I don't think the criminal justice system will ever see John
Johnson again.  I think when he comes out he will go ahead and
lead a law-abiding life.  And I would ask the court to impose a
sentence of 20 years.  Thank you, Judge.

D1G9JOHS

1          THE COURT:  Thank you, Mr. Greenfield.

2          Mr. Blanche.

3          MR. BLANCHE:  Thank you, your Honor.

4          Your Honor, in the government's view one of the most

5   telling things about the presentation from Mr. Johnson is an

6   incredible lack of acceptance of responsibility.  And what I

7   mean by that is not once during the argument that your Honor --

8   that the Court just heard did Mr. Greenfield refer to

9   Mr. Johnson as the shooter.  What he did was he referred to

10  Mr. Johnson's view that was put forward at trial which is that

11  there was a young black kid who killed Bernardo Garcia.

12         Your Honor, that's not what happened.  I mean the

13  person that murdered and killed Bernardo Garcia is Mr. Johnson,

14  John Johnson.

15         THE COURT:  I'm going to sentence him based on that.

16  Are you suggesting I should sentence him to more basically

17  because he hasn't given up his right to appeal by not admitting

18  that?

19         MR. BLANCHE:  Absolutely not.  I'm not suggesting that

20  Mr. Johnson has to accept responsibility or owes Ms. Garcia an

21  explanation as to why he murdered her son.  But on the other

22  hand, when Mr. Johnson stands in front of your Honor and asks

23  for mercy, and asks for a nonguidelines sentence, and says you

24  shouldn't impose a sentence that the guidelines call for, I'm

25  different than Mr. Reed, the Court has too ask, in the

D1G9JOHS

1    government's view:  Why?  How are you different?  How do I know

2    that if I impose a sentence less than life you're going to lead

3    a law-abiding life?  Or you're going to show that you've earned

4    something less than a life sentence?

5         There are a couple -- well there's several ways that

6    the Court could perhaps -- what the Court could look to to find

7    that.  One is any showing of remorse.

8         And he doesn't have to show remorse, your Honor.  He

9    doesn't have to accept responsibility.  But it's telling that

10   he, on the one hand, refuses to accept any remorse, any

11   responsibility, any explanation for this crime.  But on the

12   other hand says that he will not have further contact with the

13   justice system.  He will lead a law-abiding life if he's

14   sentenced to something less than life.  And I do -- the

15   government does believe that that's a factor that the Court

16   should consider.

17        Mr. Greenfield spent the first significant portion of

18   his arguments to your Honor talking, again, about Mr. Johnson's

19   innocence.  Mr. Johnson is not innocent.  The Court is not

20   sentencing an innocent man.  The Court is sentencing a

21   murderer.

22        Just following up on that, your Honor.  Mr. Greenfield

23   suggested that perhaps this was an accident.  Or perhaps the

24   gun went off.  And it is true.  There was no witness that

25   testified about the exact moment when Mr. Johnson murdered

D1G9JOHS

1    Bernardo Garcia.  But what we do know is that Gregory Reed and

2    John Johnson burst into the lobby of that building.  Gregory

3    Reed immediately pulled out his gun and fired it as a warning

4    shot while Luis Navarro ran off.  Virtually immediately

5    thereafter a bullet went right through the chest of Bernardo

6    Garcia.  So we can certainly draw inferences as to what

7    happened even though nobody was there.  And the only reasonable

8    inference is that John Johnson, who had a gun, and was given a

9    gun shortly before the robbery, pulled his gun out and shot it

10   at Bernardo Garcia.

11          There is no testimony about a struggle.  Ms. Garcia is

12   right.  There is no testimony that Mr. Garcia lunged towards

13   John Johnson and in a defensive maneuver John Johnson killed

14   him.  To the contrary.  The testimony is what Ms. Garcia said,

15   which is that Luis Navarro testified that Bernardo Garcia, they

16   were playing quarters, and he was leaning over, and that's

17   consistent with the crime scene evidence.  And that's when he

18   was murdered.

19          So this is not a preplanned murder but an intentional

20   murder in the sense that John Johnson pulled his gun and killed

21   Bernardo Garcia in cold blood.

22          And also, your Honor, the government's choosing to

23   charge this as a 924(j) with no mandatory minimum has

24   absolutely nothing to do with the government's belief or view

25   of Mr. Johnson's guilt.  There is no other available federal

D1G9JOHS

murder charge for this conduct; 848(e), 21 United States Code

848(e) requires a murder during a (b)(1)(A) or a large scale

drug trafficking crime.  We didn't have evidence of that.

So the fact that this is a 924(j) crime with no

mandatory minimum is because that is the only available murder

charge in the federal system for the government.  So that's

absolutely not true.

As far as Mr. Johnson's background, the government

agrees with, I'm sure, with what the Court mentioned and also

what Mr. Greenfield said.  He is nowhere as bad a background as

Mr. Reed.

THE COURT:  Bad a background meaning criminal history?

MR. BLANCHE:  Criminal history.  Correct, your Honor.

You're comparing apples to oranges.  It appears that

Mr. Johnson was a drug dealer and that he got caught dealing

drugs both before and after he murdered Bernardo Garcia.  So

that is a factor that, in theory, would weigh in favor of a

lower sentence.

However, on the other side of that is he's a lot

different than Gregory Reed.  Because the instant offense,

Gregory Reed made a choice when he pulled his gun out and shot

it.  He, from all the testimony, shot a warning shot.  Fired in

the air.  And as society should, society should treat that

conduct different than what John Johnson did, which is pull out

a gun and murder Bernardo Garcia.

D1G9JOHS

So there's a difference between a person who fires a
warning shot, or fires a shot in the air, versus somebody who
fires right at somebody and kills him.  So as it relates to the
instant offense, in the government's view, and what happened
inside the lobby, John Johnson was worse than Gregory Reed.

He wasn't the planner.  He was a late recruit in that
he was brought on after Mr. Reed and Mr. Gonzalez were
recruited by Mr. Richardson.

But he didn't just walk in and commit the robbery.  He
was part of the plan.  He met shortly before the robbery, about
a mile away, at Hunts Point, where they talked about what they
needed to do.  He was given a gun by Gregory Reed up the block
from the building.  And he was one of the guys that went in.

So he is different than Gregory Reed in his
background.  He most certainly is.  But what you also have,
similar to Gregory Reed, is after this happened, after he
committed a murder, he didn't change his life.  And it appears
that he had opportunity to do so.  It appears that he has many
members of his family who have jobs.  His father was providing
him a place to work.  And he didn't.  Indeed, he was arrested
for drug dealing after the instant offense, your Honor.

THE COURT:  But he was working as well.

MR. BLANCHE:  Pardon me, your Honor?

THE COURT:  Doesn't the presentence report indicate
that he was also working at that same period of time?

D1G9JOHS

1          MR. BLANCHE:  Yes, your Honor.  According to what

2     Mr. Johnson told the probation officer.  And the government

3     doesn't have any information either way.  He was working at

4     that time as well, while he was also selling drugs, your Honor.

5          So I don't think the Court can be comforted by what

6     Mr. Johnson did after he committed this murder.  This wasn't a

7     wake-up call for him, where he's moved away and stopped

8     committing crimes.  The only evidence that we -- well, the

9     evidence that we have is that he continued to deal drugs and

10    indeed was arrested for dealing drugs after the instant

11    offense.

12         So those are sad facts.  And it's not something the

13    government stands in front of the court happy.  It's awful.

14    It's horrible that Mr. Johnson's family is here and is watching

15    this proceeding happening.  It's horrible that the Garcia

16    family is here watching this proceeding happening.

17         But Mr. Johnson has to be held accountable.  This

18    murder was not committed by a young black kid.  It was

19    committed by John Johnson, your Honor.

20         And there's a reason why, in our society, and in the

21    federal system, someone who goes to trial on a murder case

22    faces life in prison.  It's because it is, certainly federally,

23    really the greatest crime.

24         THE COURT:  Well, look, that's all true.  But a person

25    who stalks their victim and planned meticulously for months and

D1G9JOHS

 1    then committed the murder in the cruelest possible way would be

 2    looking at the same guidelines as Mr. Johnson, right?

 3            MR. BLANCHE:  Potentially, I -- yes.  Certainly you

 4    can't go to jail for longer than life.

 5            THE COURT:  Level 43, right.  I mean 43 is 43.  That's

 6    what you get.

 7            MR. BLANCHE:  Correct.  Although there's certainly

 8    circumstances where it can be more than life.  There's certain

 9    gun charges that have to be consecutive.  Your Honor's correct.

10    There's some counts that carry mandatory life, and that's not

11    this charge.

12            So I'm not saying that he's like every other murderer

13    who is convicted and sentenced.  But you also can't sentence

14    somebody to more than life.

15            So in the government's view this is -- this is a very

16    sad case.  It's a sad case because Mr. Johnson is a young man.

17    He was a young man when he committed this murder.  And he's a

18    young man today.

19            On the other hand, in the government's view, there is

20    nothing before the Court, based upon his role in the offense,

21    that warrants a nonguideline sentence, your Honor.

22            THE COURT:  Mr. Greenfield, anything you want to say

23    in response?

24            MR. GREENFIELD:  Just one thing, Judge.  I'm sort of

25    reminded of the conversation that takes place between

D1G9JOHS

1    Johnson -- between Reed and Richardson right after the shooting

2    takes place, where Reed says he doesn't want the kid to know

3    what happened.  If there was an intentional murder that took

4    place and the young black kid did it, why would that be said?

5            THE COURT:  Okay.  Mr. Johnson, you have a right to

6    address the court, as I said.  You don't have to, but you're

7    certainly welcome to.  And if you'd like to speak, now is the

8    time.

9            THE DEFENDANT:  No, sir.

10           THE COURT:  All right.  I'm going to take a couple of

11   minutes to think about what I've just heard.  We'll resume in

12   about five minutes and then I'll impose the sentence.  Just if

13   you want to use the restroom or get a drink you can, but in

14   five minutes we'll resume.

15           Thank you.

16           (Recess)

17           THE COURT:  Let me state the sentence I intend to

18   impose and my reasons for it.

19           After that I'll ask the lawyers if there's any reason

20   under the law that I can't impose that sentence.  And if there

21   is no legal impediment, then I'll formally impose the sentence

22   at that point.

23           Mr. Johnson and to everyone who is here, our system

24   requires judges to explain their sentence.  And I think that's

25   a good thing.  I think it's -- this is an important day for

D1G9JOHS

you, Mr. Johnson.  It's an important day for your family.  It's
an important day for Mr. Garcia's family.  This is something
that weighs heavy on everybody.  I'm very familiar and
sensitive to that.  So I think it's very important for me to
explain what went into my thinking as to why the sentence I
impose is the appropriate sentence.

        This is a difficult case.  I agree with what
Ms. Garcia said, that two families have been very much
destroyed by this crime.

        I look at the Garcia family and I think that young man
and all he might have been has been extinguished.  We'll never
know.  And not only will we not know, his family will not have
his presence ever again.  They've been deprived of that.
That's the cruelest loss of all.  And that requires punishment.

        I look at the family members of Mr. Johnson.  I think,
Well, this is a family that's suffering too.  I think about
your child and others who are perhaps not here who are still
very much victims of this crime.  They didn't do anything wrong
and yet they are going to be affected very much by this
sentence.  And that's heartbreaking.  That's not right.  That's
not fair.  But it is, sadly, the reality that comes with crimes
being committed by individuals.  The impact of the sentence on
those individuals has great reach and it really makes a
difference in the lives of people who desperately need their
father or their brother or their loved one.  That's -- I wish

D1G9JOHS

1    there was some way around that.  But that is the reality.  So

2    that -- I just say that because I think it's important for

3    everyone here, whether or not you have strong feelings about

4    what the appropriate sentence will be, to understand that this

5    is not something that's taken lightly.  This is something that

6    I and I think every judge in my place takes very, very

7    seriously and weighs very, very carefully.  The system is not

8    supposed to be vindictive.  It's not supposed to be reflexive.

9    It's supposed to be deliberate and careful and thoughtful.  And

10   I've certainly thought a lot about this case.

11           On the one hand I look at Mr. Johnson and I think that

12   he was 19 or so when he committed this crime.  So he was quite,

13   quite young.  That's different than Mr. Reed.  That's different

14   than Mr. Richardson and Mr. Gonzalez.  He was a very, very

15   young man at the time he committed this crime.  And young men

16   do foolish and destructive things sometimes.

17           In addition his criminal history was, I think, very

18   distinguishable from that of Mr. Reed, whom I sentenced

19   yesterday.  Mr. Reed had serious convictions for which he did

20   serious time.  Crimes of violence.  And repeatedly.  He was,

21   just basically, every time he got out he committed more crimes.

22           Mr. Johnson committed some serious crimes, drug

23   crimes.  No crimes of violence that I'm aware of.  But the drug

24   crimes are serious and they do violence.  Certainly selling

25   crack to someone is destructive.  It's destructive of that

D1G9JOHS

individual's well-being and destructive of families and

communities.  So I don't mean to understate the significance

and the moral culpability of selling drugs.  And Mr. Johnson

did that on three occasions that he got convicted for.  But the

sentences he received were relatively light:  Two sentences of

30 days and one of approximately a year in which he got out

sooner.

        The other thing that I think has to be noted is that

Mr. Johnson, after his release on the more serious drug crime,

and that was a crime committed when he was about 20, appears

that he's had no repeat connection to the criminal justice

system other than the criminal trespass that's set forth at

paragraph 42.  The presentence report indicates he was working

up until the time that he was arrested for this crime in 2011.

That's not really corroborated.  It's disappointing to me that

the probation department didn't get corroboration.  But they do

seem to have very specific information about where he was

working and when.  And certainly the absence of additional

convictions suggests that perhaps Mr. Johnson was starting to

get it and perhaps he was going to mature out of the lifestyle

that he put himself in as a young man.

        So, those are the things that I think distinguish him

from Mr. Reed.  Of course, the other factor that distinguishes

Mr. Johnson from Mr. Reed is that Mr. Johnson is the one -- the

jury found it and I'm prepared to find it -- is the one who

D1G9JOHS

1    pulled the trigger that killed Mr. Garcia.  That makes him more

2    culpable than Mr. Reed in terms of the conduct on the day of

3    the murder and the robbery.  And I think that can't be ignored

4    either.

5         I think about the sentencing I had yesterday, and most

6    of you weren't here for it, but Mr. Schneider, who is a very,

7    very capable lawyer representing Mr. Reed argued for hope and

8    the need for a person serving a lengthy jail sentence to have

9    some hope and that they will return to their loved ones before

10   they die.  And I think as a general matter that's true.  I

11   didn't find that to be a persuasive argument yesterday with

12   respect to Mr. Reed because of -- because of the extent, scope,

13   and severity of his criminal conduct, which suggested to me

14   that he really had forfeited any right to hope, at least to

15   hope for being released from jail before his natural life.

16        I don't think Mr. Johnson is in that same category.  I

17   do think it's important that he have some hope and that he be

18   able to return to his family at some point before his life

19   expectancy is reached.  But, there is no way I'm going to

20   sentence Mr. Johnson to 20 years or anything close to it.  The

21   sentence I intend to impose is less than a life sentence but

22   it's a 40-year sentence, which means with good behavior

23   Mr. Johnson could be home in his late 50s or early 60s, and I

24   think that's still a life.  That's still an opportunity that

25   Mr. Garcia will not have and that Mr. Garcia's family will feel

D1G9JOHS

1    the loss of for the rest of their lives.

2            I don't mean to suggest that that's a light sentence.

3    But it's less than what it could be.  It's less than what

4    Mr. Reed received.  And it's less than what the government and

5    perhaps others have asked for.

6            I think it's an appropriate sentence in light of all

7    those things I just talked about.  But I don't for a moment

8    want anyone to think that I don't -- I don't recognize the loss

9    of the Garcia family.  It is tragic and it's irreversible.  And

10   it happened to Mr. Garcia and to his family.

11           So I intend to impose a 40-year sentence.  It will be

12   20 years each on Counts One and Two and 40 years on Count

13   Three, to run concurrently.

14           I will impose a term of supervised release of three

15   years on Counts One and Two, and five years on Count Three, all

16   to run concurrently.

17           I will not impose a fine.  I don't think there's

18   really any ability to pay a fine.

19           The government is not seeking forfeiture so I'm not

20   going to order forfeiture.

21           The government has not sought restitution, I don't

22   think, either.

23           So I will order, however, a $300 special assessment.

24           There is standards and conditions associated with

25   supervised release.  I will impose those.  So if and when

D1G9JOHS

 1    Mr. Johnson is released, he will have to abide by the

 2    conditions that are set forth at pages 17 and 18 of the

 3    presentence report.  I'll announce them when I impose the

 4    sentence formally.  But that is what they are.

 5            Okay.  Is there any legal impediment to my imposing

 6    that sentence, Mr. Blanche?

 7            MR. BLANCHE:  No, your Honor.

 8            THE COURT:  Mr. Greenfield?

 9            MR. GREENFIELD:  No, your Honor.

10            THE COURT:  All right.  Mr. Johnson would you please

11    stand.

12            Mr. Johnson, having received the jury's verdict of

13    guilty on all three counts of the indictment, I now sentence

14    you as follows.

15            I sentence you to a term of incarceration of 20 years

16    each on Counts One and Two, and 40 years on Count Three, each

17    to run concurrently.  Those terms will be followed by a term of

18    supervised release of three years on Counts One and Two, five

19    years on Count Three, also to run concurrently.  The supervised

20    release will include the following standard mandatory and

21    special conditions.

22            First you shall not commit another federal, state, or

23    local crime.

24            You shall not illegally possess a controlled substance

25    of any kind, that's marijuana, that's prescription drugs for

D1G9JOHS

1    which you don't have a prescription, that's any controlled

2    substance.

3              You shall not, of course, possess a firearm or a

4    destructive device of any kind.

5              You shall also cooperate in the collection of DNA as

6    directed by the probation officer.

7              There are 13 standard conditions of supervised release

8    that are imposed in virtually every case involving supervision.

9    I will impose those here.

10             I will also impose the following special conditions.

11             First, that you will participate in a program approved

12   by the probation office which will include testing to determine

13   whether you're using drugs or alcohol.  That will be a

14   treatment program with testing.  The court -- I authorize the

15   treatment provider to provide information and the results of

16   tests to probation.  And I authorize probation to share

17   information with the treatment provider so that each can be

18   aware of how you are doing and whether or not you're complying

19   with the terms of your supervision, whether or not you're

20   complying with the terms of the program that you're associated

21   with.

22             You will be required to contribute to the costs of

23   that program to the extent you can afford to.  So if you're

24   working and can help defray the costs, you should do that.  If

25   you're not working but you have access to insurance, public or

D1G9JOHS

1    private insurance, to cover those costs, then you'll be

2    expected to cover those costs through the insurance that you

3    have.  If you don't have any access to payment, then the Court

4    will bear those costs because it's important and required that

5    you get that treatment.

6        All right.  You'll also be -- the probation report is

7    asking for alcohol aftercare treatment program which I think is

8    really what I'm authorizing here is drugs and alcohol.  To the

9    extent that there are separate programs, then that's fine.  But

10    the fact is you'll be tested.  You'll get tested to see whether

11    you're using drugs and alcohol.

12        You will provide the probation officer with any

13    requested financial information.

14        You will also submit your residence, your place of

15    business, your vehicle, or any other premises that you control

16    to a search in the event that the probation officer thinks that

17    there might be evidence of a crime or evidence of a violation

18    of your supervised release within those premises.  So you have

19    to agree that you will be subject to a search when probation

20    thinks a search is appropriate.  The search would have to be

21    done in a reasonable manner and at a reasonable time.  But if

22    you declined to allow that search, then that would be a

23    violation of your supervised release and you would be

24    resentenced.  So you have to allow that.

25        Another thing you have to do is you have to notify the

D1G9JOHS

1   people with whom you share premises.  If you're living with a

2   relative or a friend, you have to tell them that you are

3   subject to the search requirement so that they understand that

4   if they commingle their things with yours, then their things

5   could be searched too.  By giving them that notice, you'll give

6   them the opportunity to protect their own privacy rights.  All

7   right.  So you have to let them know that.

8           I am going to direct that you report to the nearest

9   probation office within 24 hours of your release from custody.

10  However, if it's a weekend, then the next business day.  Okay.

11  But you should -- so when you get out, you should come home.

12  Have a nice meal with your family.  But then the next day I

13  want you to go to the probation office will be in this

14  courthouse.  And then immediately begin reporting and abiding

15  by the conditions of your supervised release.

16          As I said, I'm not going to impose a fine.

17          I am going to impose a three hundred dollar special

18  assessment, one hundred dollars for each count of conviction.

19          Are there any recommendations you'd like me to make,

20  Mr. Greenfield?

21          MR. GREENFIELD:  Yes, your Honor.

22          He asked that he be incarcerated within the --

23  somewhere within the northeast region of the United States.

24  Bureau of Prisons of Northeast Region.

25          THE COURT:  All right.  So I'll recommend that.  I

D1G9JOHS

can't order that.  But I'll recommend that it be somewhere in
the northeast so your family is able to visit you more easily.
So I will make that recommendation.  Okay.

All right.  There are no open counts, Mr. Blanche?

MR. BLANCHE:  No, your Honor.

THE COURT:  Okay.  Mr. Johnson I should tell you, you
have a right to appeal this sentence.  I think you're already
contemplating an appeal.  I've appointed Mr. Neuman to assist
with that appeal.  But you need to file a notice of appeal
within two weeks.  Probably two weeks from tomorrow when I
issue the judgment.

So talk to your lawyers about filing that notice.  I
think they're on it.  But that's something that I think you'll
have to do.

Have a seat.

Let me say this to Mr. Johnson's family.  That's a
long sentence.  I'm not oblivious to that.  That's a hard
sentence on you too.  I'd ask you to continue to support him.
He's going to need your support more than ever.  So write to
him.  Visit him.  Be a part of his life.

And Mr. Johnson, I will urge you to remember that the
fact that you are incarcerated for a lengthy term doesn't mean
that you can't maintain relationships with people, with your
family members, those who are here today and others who really
are depending on you, including your child.

D1G9JOHS

1         So take that seriously.  Do everything in your power

2    to make sure that you can be a father and you can be a friend

3    and relative to people who count on you.  I think it's in your

4    interests to do that as well.

5         And I want you also to reflect on what happened here

6    and the loss that the Garcia family is experiencing everyday.

7         And to, finally, the Garcia family, I don't know

8    whether you came here with a sense as to what you thought would

9    be an appropriate sentence.  It may have been the case that you

10   thought anything less than a life sentence would somehow

11   disrespect you and your son.  I hope you don't feel that.

12        The sentence I imposed is what I think is the

13   appropriate one in light of all the factors.  I've explained

14   it.  I don't expect everyone to agree with me.  But I hope that

15   everyone at least -- at least everyone recognizes that it was a

16   process that was deliberate and careful and thoughtful and I

17   did the best I could to hand out a just sentence.

18        I wish you the best.  It's going to be difficult

19   always for you.  And I hope that you'll find it in your heart

20   to forgive those responsible because I think ultimately that's

21   probably the best for you as well.

22        But I hope that -- look, we have two families here

23   today.  I hope you'll be respectful of each other's pain and

24   what you're going through, and I hope that on the way out

25   you'll be mindful of that.

D1G9JOHS

1            So let me thank the marshals.  Let me thank the court

2    reporter.  And let me thank the attorneys for their efforts in

3    this case.

4            Okay.  Good luck to your, Mr. Johnson.

5            Thanks.

6            (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25